MAY 1 9 2006

DAVID J. MALAND, CLERK
BY
DEPUTY

1    IN THE UNITED STATES DISTRICT COURT
     FOR THE EASTERN DISTRICT OF TEXAS
2    MARSHALL DIVISION

3    FORGENT NETWORKS, INC.,          )
                                      )    DOCKET NO. 2:05cv318
4         -vs-                        )
                                      )    Tyler, Texas
5                                     )    10:00 a.m.
     ECHOSTAR, ET AL                  )    May 9, 2006
6

7            TRANSCRIPT OF MOTION HEARING
        BEFORE THE HONORABLE LEONARD DAVIS
8          UNITED STATES DISTRICT JUDGE

9              A P P E A R A N C E S

10

     FOR THE PLAINTIFF:      MR. WILLIAM FRED HAGANS
11                           MR. SCOTT G. BURDINE
                             MR. JARED LEVINTHAL
12                           HAGANS BURDINE MONTGOMERY
                                RUSTAY & WINCHESTER
13                           3200 Travis, Fourth Floor
                             Houston, Texas   77006
14
                             MR. JEFFREY S. WHITTLE
15                           MR. ROSS KENNEDY
                             BRACEWELL & GIULIANI
16                           711 Louisiana St., Ste. 2300
                             Houston, Texas   77002-2770
17
                             MR. CARL ROTH
18                           MR. MICHAEL SMITH
                             THE ROTH LAW FIRM
19                           115 N. Wellington, Ste. 200
                             P.O. Box 876
20                           Marshall, Texas   75671

21   COURT REPORTER:         MS. SHEA SLOAN
                             211 West Ferguson
22                           Tyler, Texas   75702
                             903/590-1176
23

24   Proceedings taken by Machine Stenotype; transcript was
     produced by a Computer.
25

```
 1   FOR THE DEFENDANTS:        MR. MICHAEL JONES
                                POTTER MINTON
 2                              110 North College, Ste. 500
                                P.O. Box 359
 3                              Tyler, Texas   75710

 4                              MR. BRIAN K. ERICKSON
                                DEWEY BALLANTINE
 5                              401 Congress Ave., Ste. 3200
                                Austin, Texas   78701
 6
                                MR. LANCE LEE
 7                              YOUNG, PICKETT & LEE
                                4122 Texas Blvd.
 8                              P.O. Box 1897
                                Texarkana, Texas   75504-1897
 9
                                MR. KEVIN McBRIDE
10

11                             MR. TRACY CRAWFORD
                                RAMEY-FLOCK LAW FIRM
12                             200 E. Ferguson, #407
                                Tyler, Texas   75702
13
                                MS. ANGELA JAMES
14                             ALSTON & BIRD
                                One Atlantic Center
15                             1201 W. Peachtree St.
                                Atlanta GA   30309-3424
16
                                MR. CHARLES BARQUIST
17                             MORRISON & FOERSTER
                                555 W. Fifth St., Ste. 3500
18                             Los Angeles, CA   90013-1024

19                             MR. TREY YARBROUGH
                                ATTORNEY AT LAW
20                             100 E. Ferguson, Ste. 1015
                                Tyler, Texas   75702
21

22

23

24

25
```

1                    P R O C E E D I N G S

2              THE COURT:  Please be seated.

3              All right.  Ms. Ferguson, if you will call the case,

4    please.

5              THE CLERK:  Court calls Case No. 2:05cv318, Forgent

6    Networks, Inc. v. EchoStar, et al.

7              THE COURT:  Announcements?

8              MR. SMITH:  For the plaintiff, Michael Smith and

9    Carl Roth.  I would like to introduce our new lead counsel,

10   Fred Hagans.  And Mr. Hagans will introduce the rest of the

11   team.

12             MR. HAGANS:  Good morning, Judge.

13             THE COURT:  Good morning.

14             MR. HAGANS:  We have several people here today to

15   introduce.  From my firm, Scott Burdine and Jared Levinthal.

16   From the Bracewell & Giuliani Firm, Jeff Whittle who is head

17   of their IP section.  And Ross Kennedy.

18             THE COURT:  Good morning.

19             MR. HAGANS:  Of course, we have got Mr. Smith and

20   Mr. Roth here.  And then for the company we have Mr. Rondini

21   and Mr. Stevens out there.

22             THE COURT:  Very good.

23             MR. HAGANS:  We are ready.

24             THE COURT:  Very good.  Welcome.

25             MR. HAGANS:  Thank you, Judge.

1    THE COURT:  What about Mr. Sankey and Mr. Luck, are

2  they here?

3    MR. HAGANS:  They are not.  They are no longer

4  involved in this case.

5    THE COURT:  At all?

6    MR. HAGANS:  They have been involved in the

7  transition.  Assuming that we have some breathing space now,

8  they will be no longer involved at all.

9    THE COURT:  Okay.

10    MR. HAGANS:  Because of -- I'm sure you can

11  appreciate the short time frame we have been in, there were

12  things that had to be done on the technological side and we

13  continued to use Mr. Luck to help us with that.  I think we

14  have now completed that transition.

15    THE COURT:  We will get into that more in a minute.

16    All right.  Mr. Jones?

17    MR. JONES:  Your Honor, on behalf of the defendants

18  Cable One, Comcast, Comcast STB, Time Warner, Charter, CoxCom

19  and Motorola, Inc., Mike Jones and Brian Erickson from the

20  Dewey Ballantine Firm.

21    MR. ERICKSON:  Thank you, Your Honor.

22    THE COURT:  Thank you.

23    MR. LEE:  Your Honor, Lance Lee and Kevin McBride on

24  behalf of DirecTV.

25    THE COURT:  Mr. Lee.

1      MR. CRAWFORD:  Your Honor, Tracy Crawford and Angela

2  James on behalf of Scientific-Atlanta, Inc., CoxCom, Comcast

3  Software, Comcast Corp., Charter Communications, and Time

4  Warner Cable.

5      THE COURT:  Thank you.

6      MR. BARQUIST:  Good morning, Your Honor.  Charles

7  Barquist for EchoStar.

8      THE COURT:  Mr. Barquist.

9      MR. YARBROUGH:  Your Honor, Trey Yarbrough on behalf

10  of Charter Communications and Digeo.

11      THE COURT:  Mr. Yarbrough.

12      Is that everyone?  All right.  Well, we have new

13  counsel in the case, and I hope that y'all are off and playing

14  well together.  And I know previously it seemed like there

15  were a lot of disputes, and I hope y'all have been able to

16  resolve a lot of those.

17      Tell me where we are, Mr. Hagans.  I will let you

18  start.  You have got a motion to compel and two or three

19  items.  Let's take up a couple of them.

20      MR. HAGANS:  All right.  Do you prefer --

21      THE COURT:  That would be fine.  I think that would

22  be a good idea.

23      MR. HAGANS:  Judge, I think that we have three

24  specific subjects that are before the Court today.  The first

25  is the motion for continuance with respect to the trial date.

1   The second is three motions to compel.  And then I believe

2   that the defendants have a motion to disqualify.

3            THE COURT:  Okay.

4            MR. HAGANS:  With respect -- if I can -- I'm not

5   going to spend much time on the motion for continuance.  I

6   believe that it is, in essence as far as I can tell, unopposed

7   at this point.  But I am not 100 percent certain of that

8   because of the way the filings have come in.  But it appears

9   that has been taken care of but in the sense of the parties --

10  obviously I'm not trying to be presumptuous with respect to

11  the Court.

12           THE COURT:  Yes.  And I had that.  I was just

13  looking at that.  And I think I left it laying on my desk.

14  Andrea or Joe, can you see if you can get that for me, that

15  proposed change to the docket control order.  I don't have a

16  problem with the continuance.  I take it none of the

17  defendants do either?

18           MR. JONES:  On behalf of the defendants, we don't,

19  Your Honor.  In fact, we also prepared a proposed order, which

20  I think both the plaintiffs and defendants have agreed to as

21  far as the dates involved with this case.

22           THE COURT:  Is that the one you filed with the

23  Court?

24           MR. JONES:  No, it is not.  It was one that was

25  exchanged last night.  The defendants made a couple of tweaks

1   to it with regard not to the trial dates and significant

2   dates, but a couple of tweaks to it.  I think it was agreed to

3   by the plaintiffs this morning.  I have it here, Your Honor.

4                  THE COURT:  Why don't you hand it up?

5                  MR. JONES:  Thank you, Your Honor.

6                  MR. HAGANS:  It is my understanding that is correct,

7   Judge.

8                  THE COURT:  The one that I was looking at this

9   morning, I don't think we had the trial date.  No.  You don't

10  have the trial date or <u>Markman</u> in there.  And I had some dates

11  that we had penciled in.  But I think we could accommodate you

12  that I was going to give you.  And we will have that in just a

13  moment.

14                 All right.  We had previously been set for a

15  February trial in Marshall.  Now, let me ask the parties if I

16  move this do you still want to be in Marshall, or are you

17  agreeable to trying the case in Tyler?

18                 MR. HAGANS:  From the plaintiffs' standpoint, Judge,

19  whichever is more accommodating for this Court we are willing

20  to do.  If moving it here to Tyler is more accommodating

21  because I know you have got a schedule here and there, we are

22  certainly amenable to moving the case to Tyler if that is your

23  pleasure.

24                 THE COURT:  What about defendants?

25                 MR. JONES:  On behalf of my clients I can speak for

1    them, and we would be amenable to moving it to Tyler.

2    MR. LEE:  That's fine with DirecTV, Your Honor.

3    MR. BARQUIST:  Also for EchoStar, Your Honor.

4    MS. JAMES:  Also for Scientific-Atlanta.

5    THE COURT:  Here is what we get into, I mean I

6    notice in here you have 10 days estimated.  I hope it won't

7    take that long.  But if it does take ten days, the Marshall

8    Courthouse all of you have been there and it is a very nice

9    courthouse but it is very crowded.  And we are -- we just had

10   a case that we were going to try over there, but we were

11   stacked up on top of Judge Folsom and Judge Ward and that type

12   of thing.  We have much more room for the attorneys.  I think

13   it is a more workable courtroom versus being in the Magistrate

14   Judge's courtroom in the basement or being camped out in

15   Marshall.

16   Plus we can keep a lot of our other stuff moving a

17   lot easier if we are here in Tyler.  If none of the parties

18   have an objection, we will move it to our Tyler docket.

19   And let me just inquire, Ms. Ferguson, when would be

20   the next trial date that we would have?  They want basically a

21   60-day -- it is currently set for February 12th.  So it would

22   be March, April -- probably be May I think of 2007 if that

23   would work for everyone.  What do we have?  We have it set

24   over here in May.

25   THE CLERK:  Your Honor, we have three cases at this

1    time.  They are all patent cases set May 7th.

2              THE COURT:  Okay.  Why don't we set it for May 7th.

3    And hopefully some of those will fall by the wayside.  Is that

4    set for jury trial?

5              THE CLERK:  That is for jury selection.  And the

6    trial would be May 14th.

7              THE COURT:  Date of trial May 14th.  And when would

8    the pretrial be?

9              THE CLERK:  Pretrial would be April 26th.

10             THE COURT:  April 26th.  Okay.  And that will give

11   you a little more time there.  And then as far as the Markman

12   Hearing, we are currently set for I think July wasn't it?

13             MR. HAGANS:  That's correct.

14             THE COURT:  And how many Markman's do we have in

15   October right now, Ms. Ferguson?  Do you have that list?

16             THE CLERK:  Judge, you took my last list.  I don't

17   have my list.

18             THE COURT:  I think I left it on my desk, too.  So

19   we will set it for either September or October.  And let's

20   see --

21             THE CLERK:  I'm not sure how current that is.

22             THE COURT:  I have already got three each one of

23   those months.  We will pick a date for the Markman.  We will

24   look at our schedule.  It will probably be in October.  And we

25   will let you know the exact date after we have had a chance to

1   look at our schedule. And I think y'all had requested

2   September 7th. Let me ask you would you rather go earlier or

3   later on Markman. If I could squeeze it in in August --

4   August, September, October, what would be the plaintiffs'

5   pleasure?

6               MR. HAGANS: I think we would prefer probably the

7   early part of October. October would be our preference --

8               THE COURT: Defendants?

9               MR. HAGANS: -- to make sure we have plenty of time

10  to get things ready.

11              THE COURT: I know there has been a change of

12  counsel. I can understand that from the plaintiffs. Are the

13  defendants comfortable with that?

14              MR. JONES: We are comfortable, Your Honor.

15              THE COURT: We will shoot for October and get you

16  the exact date for that in October.

17              Okay. I appreciate y'all getting that together and

18  getting that agreed to, and we will get that on the schedule

19  and get a new docket control order entered for you. Who has

20  this on their machine right now?

21              MR. JONES: I do, Your Honor.

22              THE COURT: Mr. Jones, we will contact your office

23  probably later today and let you know the Markman date. If

24  you will plug those other dates in and put it back to us in

25  WordPerfect, we'll get it entered for you.

1          MR. JONES:  We will do it, Your Honor.  Thank you,

2  sir.

3          THE COURT:  All right.  Good job.  What is next?

4          MR. HAGANS:  Judge, I think the next thing is -- I

5  would like to do two things, motions to compel, the discovery

6  issues.  And leading into that I realize coming into the

7  middle of a case is always a little uncomfortable because you

8  are never quite sure all of the things that have gone on with

9  predecessor counsel.  No matter how cooperative they are, just

10  things happen.  If I can give you a brief overview of what we

11  have done so you will have some idea of how we got where we

12  are here today.

13          We were employed around April 15th.  The actual

14  employment date and the date we got all of the documents

15  signed were right around that time.  Since that time what we

16  have attempted to do is the following:  Mr. Levinthal in our

17  office I believe has had a telephone conference with lawyers

18  for every party to try to work through issues and to identify

19  both agreements and I guess disputes.  We have been able to do

20  that.

21          The second thing is we have gotten all of the

22  materials moved from the Godwin Pappas Firm to Bracewell &

23  Giuliani.  And that has taken some time.  I think it was

24  finally finished the middle of last week so that both

25  electronically and physically that has been done.  Because of

1   the issues that were before the Court at that time with

2   respect to motions to compel, we obtained from one of our

3   experts and have provided to all of the parties, three

4   things.   One is 15 categories of documents that we need.

5       To sort of very specifically lay those out, give

6   detailed descriptions of those -- and I have copies of any of

7   this that you want.   Give detailed descriptions of each of

8   these categories in terms of what it includes and prepared a

9   chart by which we attempted or had our expert attempt to go

10  through and take each of the offending devices that we had at

11  the time and identify on each of these categories whether we

12  have documents that fit that category, whether we have some

13  documents but we know they are incomplete, or whether we don't

14  have documents.   And so we have prepared that.   And we have

15  provided that to all of the defendants so they can see what we

16  are talking about when we say there are specific

17  disagreements.

18      Of course, we have responded to the various motions.

19  And then just before you issued your order to set this

20  hearing, we had a telephone conference with all of the

21  defendants in which we talked about the technical advisors,

22  which was an issue that was up for that day.   We subsequently

23  filed a motion to extend that time for a couple of weeks,

24  which you granted, along with the 4-3 filings.   And although

25  we had only been in it a short period of time, we offered up

1   five technical advisors to everybody to which they have looked

2   at three and rejected them.   I think they are still looking at

3   two.

4        So I think we have accomplished a great deal in a

5   relatively short period of time.   Also, in that period of time

6   we have gotten a significant amount of additional material

7   from the defendants; that they have continued to provide

8   documents to us on CD's and supplement the discovery.   As late

9   as I believe yesterday we got materials from both Motorola and

10  Scientific-Atlanta, for example.   So we have kind of continued

11  to do that.   As soon as we get it, we are having it reviewed.

12       The vast majority of the documents have been

13  reviewed.   The things that have come in over the last 30 to 60

14  days, not all of those have been reviewed.   But I think we

15  have caught up very quickly.

16       Now, let me sort of identify I think what we have

17  been able to accomplish.   We have essentially three motions to

18  compel before the Court.   One -- let me make sure that I --

19  one is a motion to compel EchoStar with respect to the

20  documents in general.

21            THE COURT:   No. 149?

22            MR. HAGANS:   Yes, sir.   And then one is with respect

23  to the defendants with respect to Interrogatories 16 and 17.

24  We have narrowed it down to interrogatories as to certain

25  defendants, interrogatories as to other defendants.   So we

1   have narrowed that down to 16 and 17.  What we did is

2   identified that on 16, which is identifying documents,

3   nondamage documents we identified the five categories that we

4   had previously provided to them that we believe clearly fall

5   within that area.

6           And there doesn't seem to be much disagreement in

7   terms -- and I don't mean to be presumptuous and speak for the

8   defendants, but I haven't heard any real objection to the

9   categorization of documents that we believe we need.

10          THE COURT:  That is the system architecture

11  documents, electrical schematics, data sheets, design,

12  references, and application --

13          MR. HAGANS:  Yes, sir.  It starts with documents and

14  the last is API reference documents.

15          Now, here -- I think there have essentially been two

16  or three areas that appear to be in dispute.  And I'm not

17  trying to get too far into the -- but to talk about areas I

18  think of dispute.  One area that exists in terms of dispute is

19  what are the obligations as it stands today in terms of doing

20  the 26(a)(1) disclosures.  In other words, all of the

21  documents relevant to any claim or defense.  Our position is

22  those were all due in December.  They certainly should have

23  been provided to us by now.  And I think that at least some of

24  the defendants believe that is not accurate; that they only

25  have to do those things that were specifically called for

1  under the patent rules, so that is an area that we need some

2  help from the Court.

3      The second issue I think has been that this is

4  premature because people are continuing to supplement.   The

5  problem with that -- and we certainly believe that everyone

6  should supplement, and we are not in any way casting stones at

7  anyone for doing that -- but as things -- I think the time

8  schedule was set up -- again, this should have been done 45

9  days after your case management conference.   Here we are now

10  five months later and we are still getting documents.   And one

11  of the things we need is when are we -- what is our drop-dead

12  date?   When are people going to finish their document

13  production and be able to certify to us that it is complete?

14      And by that I am not asking people to be perfect or

15  omniscient but to get the documents so we can then do our 3-1

16  and our 4-2, all of the things we need to do, we need to get

17  those documents so we can do that.   So we need some guidance

18  from the Court, some deadline by which that can be finished so

19  we can then move forward to the next step of this particular

20  case.

21      So the prematurity argument I understand because

22  people are continuing to supplement, but it is not premature

23  because the deadline has already passed, so we are asking for

24  help from the Court to essentially order these categories of

25  documents to be produced and give us a deadline by which they

1   can be produced.

2          The third area of discussion among the parties has

3   to do with documents that may not be in a party's physical

4   possession; that is, someone else may have let's say the

5   source code.  And the question there is sort of specifically

6   how we are going to either get that or get help to get that

7   because -- there have been some who have said we have produced

8   documents that are in our control.  There may be documents

9   that are in other people's possessions that are relevant.

10  Well, that doesn't give us much comfort.

11         The fourth area that I think that needs to be

12  addressed has to do with source code.  Some defendants have

13  produced some source code.  Some have said well tell us why

14  you think that particular source code is relevant; and some

15  have said we don't think we have to produce source code to you

16  at all.  So we are trying to work through those issues because

17  we believe that source code was called for.  We specifically

18  asked for source code.  We have got to have it.

19         What we are looking for are the documents that

20  basically we can take and build one of these machines up to

21  show that it infringes.  That is what we have to do, and that

22  requires the source code and all of the things that make the

23  source code work.  And so that is what we are asking for.  So

24  the source code is one of those things.

25         Even though I think it was covered generally by your

1    protective order, to the extent that anyone is uncomfortable

2    with that, we offered yesterday, said if you want to have a

3    third party escrow agent to deposit this source code just let

4    us know what kind of protocol you would want.  If you want to

5    use Iron Mountain.  Let's get that done.  We need to get it

6    done quickly because we essentially need some period of time

7    after we get the source code so that we can complete the

8    infringement contentions completely.

9          So those are what I would consider to be the four

10   key areas that are not yet in full agreement with all of the

11   defendants.

12         The only other area -- and this isn't really covered

13   by the motion to compel, has to do with how things are

14   produced.  That is, for example, if something is produced, it

15   is going to be produced in the way it is ordinarily kept and

16   in the way, for example, a software engineer would actually

17   use it.  At least our expert feels that some of the things

18   have been broken apart; and whether that is inadvertent or

19   just the way it got produced, I don't know, but the things

20   didn't seem to fit.  But, again, we are not suggesting in any

21   way -- I want to make this absolutely clear -- we are not

22   suggesting in any way that people have been guilty of any kind

23   of misconduct.  But we do need to have some way to make sure

24   that we get all of this in a usable fashion to be efficient.

25         So that is, in essence, where we are on the motion

1    to compel, what we are asking you to do.  And we have an

2    order, very specifically is to order the production of these

3    categories of documents and to order specifically with respect

4    to EchoStar that they comply with all of their 26(a)(1)

5    disclosures and that you give us a deadline by which the

6    defendants will do this.

7              THE COURT:  All right.  Response?

8              MR. JONES:  Your Honor, if I could I will lead off

9    on this.  I speak for the Cable Defendants.  There are really

10   three different motions.  There is a motion with regard to

11   EchoStar.  There is a motion with regard to the Satellite

12   Defendants and a motion with regard to the Cable Defendants.

13   I would like to start off with that motion.

14              I would like to first say that it is my

15   understanding that Interrogatory No. 17 has been agreed to

16   with regard to the Cable Defendants and there is no dispute

17   remaining concerning that.  And I think that is correct unless

18   someone corrects me from the plaintiffs' side.

19              THE COURT:  All right.  Is that correct that

20   Interrogatory No. 17 is agreed to?

21              MR. LEVINTHAL:  Your Honor, subject to the issues

22   that were in the notice that was filed yesterday by the Cable

23   Defendants, that is correct.

24              THE COURT:  All right.

25              MR. HAGANS:  And let me just tell Mr. Levinthal that

1    whenever you stand up make sure you tell your name because not

2    everybody knows you here yet.

3            THE COURT:  Thank you.

4            MR. JONES:  And I would like to point out to the

5    Court at the outset is that we are not really arguing about a

6    motion to compel.  This originally started as a motion to

7    compel answers to interrogatories, and there were a dozen

8    interrogatories involved.  We are now down, with regard to the

9    Cable Defendants to one interrogatory.  But that interrogatory

10   is not what we are talking about here today.  We are not

11   talking about a motion to compel in answer to this

12   interrogatory.  He has just argued that motion to compel

13   production that has never been filed, never been responded to,

14   and we have never had an opportunity to comment on it.

15           But having said that, we have tried to consider their

16   concerns and come up with a way to alleviate those concerns.

17   Let me just point out to you, Your Honor, that Interrogatory

18   No. 16 asked us to identify documents concerning DVR set-top

19   boxes and to identify specifically six things;  circuit

20   schematic diagrams, circuit component data sheets, source

21   code, production specifications, product or circuit theory of

22   operation, hardware or software design specs.  That is what

23   they asked us to do to illustrate or describe data path or

24   control logic in the answer to the interrogatory.

25           We provided answers to interrogatories.  They moved

1    to compel.   We provided supplemental answers; and really their

2    only comments in their papers that I can see, and certainly

3    Mr. Hagans didn't add anything to it, was they didn't like our

4    supplementation because we said as further documents become

5    available we will make you aware of them and we will

6    supplement in that regard.   That is the only thing in the

7    papers that I can find that has ever been criticized about our

8    answer.

9            THE COURT:   Let me interrupt you.   Is that correct,

10   Mr. Hagans or Mr. Levinthal?

11           MR. LEVINTHAL:   Your Honor, with respect to the

12   response they have in their interrogatory answers said that

13   further supplementations would be forthcoming, that is

14   correct.

15           THE COURT:   Okay.   But is other things he said

16   basically correct that you are satisfied with the answer other

17   than you want a cut-off on the documents?

18           MR. LEVINTHAL:   We are satisfied with the answer

19   with the exception we know, in fact, they have not identified

20   an adequate universe.   When that further production is

21   forthcoming is really the issue because we get documents in,

22   Your Honor, as recently as yesterday.   We need an end in sight

23   so we can make --

24           THE COURT:   I am just trying to narrow down what we

25   are really arguing about is you want an end in sight, right,

1    that is all you are wanting out of Interrogatory No. 16?

2              MR. LEVINTHAL:  With respect to the categories of

3    documents, yes, Your Honor.

4              THE COURT:  Mr. Jones?

5              MR. JONES:  I think the other thing they want, Your

6    Honor, by listening to their argument is they want a new

7    interrogatory there other than the one they put there before.

8    That really occurred when they sent us an e-mail on May 2nd.

9    And on May 2nd they greatly expanded what they wanted and they

10   said, you know, really what we want is with regard to all

11   these systems, system architecture documents, electrical

12   schematics, all data sheets, design references, application

13   notes for devices used in the system, complete source code

14   packages, and software design documents.

15             They also then gave us at that time for the first

16   time on this May 2nd date these 15 categories of documents

17   that they said they wanted us to provide documents for.  Now,

18   since that time we have been supplementing our production so

19   as to provide them with those documents.  And on behalf of our

20   clients and on behalf of Motorola, I want to make clear to the

21   Court that it is our position that we have produced those

22   documents under both those categories that are relevant to

23   this litigation.  But I think that is the key thing to say so

24   that we don't speak over ourselves when we talk about what is

25   actually relevant for this litigation.

1        If I could approach the table and just get

2   something, Your Honor?

3        THE COURT:  Yes.

4        MR. JONES:  This is a bill of materials, Your Honor,

5   for one of the five or six products that is at issue in this

6   case for Motorola.  These products contain 2400 different

7   parts and devices.  These products -- if you look at all of

8   the differences in them that are listed here, you are talking

9   about 13,000 different parts and devices in these systems.  If

10  you take their order as written, then we have to provide this

11  with regard to all those products.

12       It is clear that all of these parts and devices in

13  here are not relevant to this litigation.  Lights wouldn't

14  be -- how the light panel works, power converters.  Just by

15  way of example whole cable modem subsystems.  They wouldn't be

16  relevant to this litigation at all.  We shouldn't have to

17  produce them.  Yet under their order we would have to produce

18  them.  We have gone to them -- in fact, yesterday I was on the

19  phone with Mr. Levinthal.  We have said, look, we produced

20  what we think are relevant.  Look through it, tell us what we

21  have missed.  If there is something we have missed, we will

22  produce that and we will try to do that and we will try to

23  accommodate you; and if we have a dispute eventually we may

24  have to go to the Court.  This is not the time to do that.

25       He was really frank back with us and said we really

1   can't tell you.  We can't tell you where you have missed it.

2   We can't tell you where you have not used the appropriate

3   relevancy standard.  So at this time, again, we can tell you,

4   Your Honor, that the order they suggest that you enter is

5   much, much too broad.  Our proposal -- and I think it is much

6   more workable -- is that within 14 days, or another

7   mutually-agreeable deadline, that they supplement their

8   response to the interrogatory, and let us know what the

9   relevant devices and programs are, you know, in the system.

10  You know, what do we need to produce documents about?

11          Now, keep in mind, Your Honor, we have already done

12  that.  We have already given them what they thought they

13  needed.  We have answered their interrogatory once.  They have

14  complained about it again on May 2nd.  We have given them more

15  documents after that complaint on May 2nd.  But we are saying

16  okay, look at what we have produced.  Take 14 days to do it.

17  And let us know what we have missed, what more relevant might

18  be there.  Have we missed our view of what is relevant in this

19  case; is that --

20          THE COURT:  What is wrong with that, Mr. Levinthal?

21          MR. LEVINTHAL:  Your Honor, can I address here?

22          THE COURT:  Either place is fine.

23          MR. LEVINTHAL:  Your Honor, I don't think that there

24  is anything inherently wrong with that plan.  However, there

25  are some inaccuracies, which I think need to be pointed out.

1   On November 9th, 2005 every defendant in this room received a

2   letter from Greg Luck which identified 43 categories of

3   documents that Forgent believed would fall under any relevant

4   claim or defense and asked that those documents be produced in

5   a timely fashion --

6   　　　　THE COURT:  I don't want to go back in the history.

7   I am looking for a relevant solution.  It sounds like that is

8   a reasonable one.  If you agree with it, let's just do that.

9   　　　　MR. WHITTLE:  Your Honor, Jeff Whittle.  One of the

10  reasons we have trouble with what their proposal is, No. 1, is

11  that their proposal, unless there is clarification from the

12  defendants, is they only want to produce subcomponents of the

13  system.  We want to understand the complete system because we

14  believe the complete system is important in explaining to the

15  Court and explaining to the jury the infringement analysis for

16  the 3-1 disclosures.  For us to be piecemealed with documents

17  that it is not clear, clearly marked what they are relevant

18  to, how they apply is frustrating.  And so we would like to

19  understand the system and be able to disclose to the Court in

20  the 3-1 disclosures.

21  　　　　They have not produced the source code and we need

22  the source code.  And when their proposal says 14 days, we

23  need time to analyze the source code.  And we are asking for

24  30 days to analyze the source code.  Once we get access to the

25  source code, we need 30 days to supplement and fill out the

1   3-1 disclosures, Your Honor.

2           MR. JONES:  Your Honor, we are not trying to

3   hamstring them, Judge.  We were trying to move it along

4   quickly.  Thirty days would be fine with us.  We were then

5   saying 14 days after they got back to us --

6           THE COURT:  When can you get them the source code?

7           MR. JONES:  On behalf of my clients, Judge -- and

8   that is where it gets different defendant by defendant -- on

9   behalf of my clients we have given them copies of source code.

10  And we are also willing to make the total source code

11  available for them by inspection in accordance with the terms

12  of Mr. Hagans that we have --

13          THE COURT:  Any other defendants disagree with that

14  protocol for source code?

15          MR. LEE:  Your Honor, if I may, Lance Lee on behalf

16  of DirecTV.  We are in that other category of defendants that

17  Mr. Hagans mentioned with respect to the group that doesn't

18  make the set-top boxes.  We buy our boxes from other entities.

19          THE COURT:  So you don't have any source code?

20          MR. LEE:  We don't have the source code.  And the

21  dispute, if you will, regarding that issue is what obligation

22  are we under to try and facilitate the disclosure of the

23  source code?  What we have done, DirecTV specifically, is we

24  have sent a letter to all of these manufacturers advising them

25  of the lawsuit, advising them of our obligations under the

1   rules, and requesting that we be allowed to disclose source

2   code or be given the source code to disclose to plaintiffs.

3          We have without fail had that request rejected.

4   What we have proposed to them is that they simply subpoena

5   those entities, and they have indicated they don't believe

6   they have to do that.

7          THE COURT:  Okay.  You are willing to produce -- if

8   this Court orders you to -- what source code is in your

9   possession, right?

10         MR. LEE:  Yes, Your Honor.  I can tell you my

11  understanding is we do not have any source code at all.  And

12  we have produced all of the information that we have received

13  from these manufacturers, but they will not give that to us.

14         THE COURT:  What do you expect the Court to do with

15  their suppliers?

16         MR. WHITTLE:  Your Honor, two issues.  As you can

17  see, their names are on the boxes.  It is their devices.  We

18  believe that everything that is under the control should be

19  produced, ordered to be produced including the source code --

20         THE COURT:  How do they get it if their suppliers --

21         MR. WHITTLE:  We are glad to subpoena third

22  parties.  They need to identify to us the third parties that

23  have the source code information, and we will be glad to

24  subpoena and get the information.  But we would like an order

25  from the Court so we can then show the third-party defendants

1  that we're allowed to give access to the source code within

2  the subpoena powers.

3  MR. LEE:  Your Honor, we have provided them with the

4  names of the manufacturers.  I believe that they even have our

5  contracts with those manufacturers.

6  THE COURT:  I don't see what the problem is.  Why

7  don't you go subpoena them?

8  MR. HAGANS:  I'm sorry for us to keep jumping up and

9  down.  This won't ordinarily happen --

10  THE COURT:  This is how it happens all the time.

11  MR. HAGANS:  I'm sorry, Judge.  In this short

12  period of time we have segmented what we have been doing.  I

13  guess part of our question is what do their supplier

14  agreements say about their right to get those things because

15  we haven't seen that.  If they have any right to get it or an

16  order from you would help them go to these people --

17  THE COURT:  He has just indicated to you and I take

18  him at his word that they have written and requested and been

19  rejected, so now you need to go subpoena it.

20  MR. HAGANS:  We will do that.

21  THE COURT:  All right.  And you have got the list to

22  do it.  That takes care of them.  Mr. Jones says he will give

23  you his source code.  When can you do that by?

24  MR. JONES:  That's correct, Your Honor.  It is

25  available for inspection now.  And we have given them copies

1    of that in our possession and we will certainly go to the

2    third parties that are applicable and ask them for it and

3    cooperate with them in every respect.

4        THE COURT:  When can you have all of the source code

5    available to them?

6        MR. JONES:  It is available now, Your Honor.

7        THE COURT:  Anybody disagree with that from the

8    plaintiffs?

9        MR. HAGANS:  If they say it is available we will

10   take them at their word and we will get in touch with them to

11   make that arrangement.

12       THE COURT:  Any other problem?  Does EchoStar have

13   problems with the source code?

14       MR. BARQUIST:  Your Honor, we don't have a problem.

15   Let me, if I could, explain our position.  We have produced

16   pieces of the source code to the plaintiff already.  We have

17   asked them to explain why they think they need more.  And so

18   far we haven't gotten a response.  We are prepared to work

19   with them if they identify pieces of the source code they

20   think they need.  I should just say parenthetically it is our

21   view generally that source code is not really necessary in

22   this case given the high level of the claims involved.

23       But that said, that said, if they identify

24   additional pieces of source code that they think they need, we

25   are prepared to work with them to produce that.  In terms of

1   the specific mechanism of production, Mr. Hagans said he sent

2   a letter yesterday proposing a specific mechanism that is not

3   the mechanism we have used in other cases so I would like to

4   reserve the right to work with him on a mechanism. But that

5   is our position. We are prepared to produce source code as

6   needed.

7          THE COURT: Mr. Hagans, do you know what source code

8   you don't have that you need?

9          MR. HAGANS: The answer is yes. Because we want all

10  of it so that we can show how you build this machine up. What

11  they want us to do is say, well, tell us only this part or

12  this part or this part and why is that relevant. And the

13  answer -- I have a math degree. I'm not an engineer.

14  Eventually we want all of them --

15         THE COURT: Okay. That is enough. Let them have

16  all of the source code, work out a protocol to get it to them.

17         MR. BARQUIST: Yes, Your Honor.

18         THE COURT: All right. Everybody has got the source

19  code so we have got the starting point, right? I mean, there

20  is nothing else you are going to need, you know, as far as --

21  I mean that source code is pretty much the bedrock thing you

22  feel like you need to move forward?

23         MR. HAGANS: Yes, Your Honor. I mean, obviously we

24  need the software that goes with it, any of the files and

25  things -- what any software engineer would use for that, the

1   answer is yes.

2           THE COURT:  Mr. Jones, are you taking good notes?

3           MR. JONES:  I'm going to, Your Honor.

4           THE COURT:  All right.

5           MR. JONES:  Either that or get a transcript.

6           THE COURT:  I'm going to ask you to take good notes

7   and circulate a proposed order to Counsel dealing with this.

8           MS. JAMES:  Your Honor, just briefly on behalf of

9   Scientific-Atlanta since Mr. Jones spoke with respect to

10   Motorola.  With respect to source code we had made a proposal

11   to Mr. Luck regarding stipulating -- possibly stipulating to

12   any facts they wanted to prove through source code.  That

13   proposal was never responded to.  We told new counsel if they

14   do not like that proposal we will produce the source code.  So

15   we do not object to that.

16           Along the lines of Mr. Barquist we need time to

17   evaluate the proposal you sent out last night regarding

18   mechanism of production.  And I can get back to you very

19   quickly about that.  We agree that not everything is relevant.

20   We also have the same problem where some components are going

21   to be manufactured by third parties, and so there is some

22   source code we will not have.  But certainly what we have we

23   will make available and we think we will able to reach an

24   agreement quickly on that method of production.

25           THE COURT:  Very good.  All right.  What else needs

1   to be resolved?

2          MR. WHITTLE:  Your Honor, just along the same lines

3   we want to make sure that the production on some of the

4   schematics, a lot of the diagrams are covered up.  There is a

5   lot of diagrams, applications of specific circuits.  And we

6   have asked for information on what is inside of these boxes.

7   Some of them are programmable, relate to source code and how

8   these things are specifically designed and programmed.  We

9   just want that information, as well.  We just want to make

10  sure the defendants are willing to disclose that and provide

11  us those documents.

12         THE COURT:  Any problem with that?

13         MR. JONES:  On behalf of my clients we believe we

14  have provided them.  That is fine, Your Honor.

15         THE COURT:  I take it by the silence nobody else has

16  a problem with that.

17         All right.  What is next?

18         MR. JONES:  Since I am your scrivener, Your Honor, I

19  want to make sure I understand the Court's ruling.  I

20  understand the Court's ruling I believe on the source code.  I

21  believe I understand the Court's ruling on the schematics.  I

22  want to make sure we haven't missed something.  I just do

23  think there is an issue that I think the parties need to work

24  out, and that is which of the parties are involved, as I said

25  in the beginning.  I really don't think the Court has ruled on

1   that.  I think you expect us to work that out as we move

2   forward.

3            THE COURT:  I do.

4            MR. JONES:  Thank you, Your Honor.

5            THE COURT:  All right.  Mr. Hagans, you had like

6   four or five things.  How many of them have we knocked out?

7            MR. HAGANS:  I think that we have knocked out

8   several of them.  I think the one question that we don't have

9   is sort of an end date when all of the disclosures are going

10  to be made and the documents are going to be produced.  People

11  have said they will do it quickly, but to some extent --

12           THE COURT:  Response to an end date when you can

13  have all this done?

14           MR. JONES:  Again, our original proposal had been 14

15  days for them to supplement on interrogatory, and then 14 days

16  after that we would be ready to go.  They wanted an additional

17  30 days.  Could we have 30 days after you do that?

18           MR. HAGANS:  That's fine with us.

19           THE COURT:  Thirty and thirty.

20           MR. JONES:  Thirty and thirty.  Thank you, Your

21  Honor.

22           THE COURT:  What is next?

23           MR. HAGANS:  The other item that I had mentioned had

24  to do with how things are going to be produced; that is, for

25  example, source code should be produced in the way the

1    engineers could use --

2            THE COURT:  Absolutely.  Source code, no scrambling

3    of files, produce it as logically and with tabs and headers

4    and everything just like you would want your people giving it

5    to you, to defense counsel to look at.

6            MR. HAGANS:  Not to beat that, but, for example,

7    technical documents need to come in PDF.  By and large they

8    have the last couple of weeks all of the sudden each sheet was

9    sort of taken apart and put in a TIFF, which means you have to

10   open each separate one.  A 20-page document means you have to

11   open 20 TIFFs.  I know that people make those mistakes.  If we

12   could get technical documents in the PDF format that people

13   were doing.  Nontechnical can be in TIFF or whatever.

14           THE COURT:  Do you have any problem with that from

15   defendants?

16           MR. ERICKSON:  Your Honor, Brian Erickson, I think

17   we produced in TIFF the entire time.  If they would like us to

18   do it in PDF, we can talk to them about the format changes.

19   That is fine.

20           THE COURT:  Very good.

21           MS. JAMES:  For Scientific-Atlanta we produced in

22   TIFF the entire time, too.  I am not sure about this specific

23   issue they are raising.  Discussing it with them we -- would

24   be difficult for us to switch, given the vendors.  But we are

25   happy to discuss that issue.  We had not been aware of it.

1    THE COURT: All right. Why don't y'all discuss it.
2    And produce it in whatever would be the easiest for
3    plaintiffs. If you have already produced, you have produced
4    it. I am not saying you need to go back and reproduce it
5    unless you can do so economically. And unless -- and if
6    plaintiff wants it produced in a different format, plaintiff
7    should bear the expense of doing that since you have already
8    done it once the first time. They should have requested --
9    and I know you are new to the case. I'm not saying you, but
10   somebody should have done this on the front end of this thing.

11        MR. HAGANS: That's true.

12        THE COURT: You will bear the expense for that. If
13   you want any of this redone, get a clear understanding going
14   forward as to how you want it and defendants produce it in
15   that manner.

16        MR. HAGANS: I think the next item was essentially
17   we have had at least either a miscommunication or
18   misunderstanding with respect to EchoStar in terms of what
19   their "to be" duties are. We believe that by this point all
20   documents relevant to any claim or defense should be produced
21   or within whatever period of time we are going to do it. Not
22   just things that are related just to Markman, for example, or
23   just things that are related to infringement. But essentially
24   if they are going to claim noninfringement, for example, they
25   are going to claim anything else -- they seem to believe that

1    their duties are not as broad as we think they are.  And I

2    guess we need some guidance from you as to what they are.

3                    THE COURT:  Response?

4                    MR. BARQUIST:  Your Honor, I think what Mr. Hagans

5    is referring to is an issue we have had with the plaintiff.

6    Back in December at the time the initial disclosures were

7    made, we -- in addition to providing many documents sort of

8    hard-copy documents electronically, we also made available for

9    inspection pursuant to Rule 34 a database which EchoStar

10   maintains in the ordinary course of business where it keeps

11   all of the technical documents relating to its products.  And

12   the name of this database is AGILE.  AGILE is a company that

13   provides this software document management system to literally

14   hundreds of companies.  You go on the web AGILE.com and read

15   all about it.  It is not anything secret or unique.

16           We did this, Your Honor, because we found this

17   system to work in other cases.  As you can imagine, EchoStar

18   is involved in other litigation.  And this AGILE system in

19   allowing the opposing parties to come in and use the search

20   tools that are in AGILE, it works a lot like Lexus or Westlaw,

21   Your Honor, putting in search terms, et cetera.  Lets them

22   come in, identify what they want and we would then print out

23   the copies, put the Bate stamp on, et cetera, and send them

24   the copies.

25           We made this offer back in December.  It was

1   ignored.  Finally in March as we were working with Mr. Hagans'

2   predecessor counsel they realized -- I frankly don't think

3   they read our letter.  They realized we made this offer.

4   There was some back and forth about whether they wanted to

5   come out and do it or not.  Finally on April 4th we wrote them

6   a letter.  We said if you would like us to go through AGILE

7   and produce the documents that are relevant to the devices at

8   issue, we will do that.

9         Again, we heard nothing from them.  And finally last

10   week Mr. Levinthal on Mr. Hagans' team asked us to go ahead

11   and do that.  We are now going to do that.  We will go through

12   AGILE.  We will print out the relevant documents that show the

13   structure and operation and functionality of the devices and

14   produce them to the plaintiff.  So I don't think there is an

15   issue really.

16         THE COURT:  What is the problem with that plan?

17         MR. HAGANS:  There is not a problem with that plan

18   now.  By the way, I think that Mr. Luck actually on April 7th

19   did request them to do that.  But that deals with a separate

20   issue.  Yes, we want them to go through that.  The question

21   is this is with respect to a specific database and documents

22   they say they are going to produce.  My question goes a little

23   broader.  That is, do they at this point in time are they

24   required to produce all documents relevant to any claim or

25   defense, not just the documents that they have identified in

1   the technical database --

2       THE COURT:  Well, what other documents do you feel

3   are relevant to a claim or defense that they have not produced

4   or offered to produce?

5       MR. HAGANS:  Well, I don't know what they intend to

6   use with respect to a claim of noninfringement or anything

7   else, and so -- invalidity, any of those kinds of issues.  I

8   don't know what they intend to use.  We know what we want.  We

9   don't know what they intend to use.  As I read the rules,

10  relevant to any claim or defense actually sort of covers all

11  of that.  If they are planning on using any of that we would

12  like to get it produced now rather than that being produced

13  six months from now.

14      THE COURT:  Response to that?

15      MR. BARQUIST:  Your Honor, we are clearly aware of

16  that standard which Mr. Hagans referred to which is in the

17  Local Rules and we intend to comply with it.

18      THE COURT:  There you go.

19      MR. HAGANS:  That takes care of it.

20      THE COURT:  All right.

21      MR. HAGANS:  The last item is, again, sort of the

22  date, thirty, and thirty; is that what we have --

23      THE COURT:  Thirty and thirty.

24      MR. HAGANS:  Okay.  I believe, subject to somebody

25  correcting me, that covers our issues on the motion to compel;

1    and we appreciate that help.

2              THE COURT:  All right.  Very well.  Mr. Jones, if

3    you will draft an order setting forth what has been agreed to

4    here today and just denying 149, 151, and 178 as moot.

5              MR. JONES:  I certainly will, Your Honor.

6              THE COURT:  All right.  Moving on to the -- are we

7    through with all of the discovery matters, and we are just

8    left with a motion to disqualify?

9              MR. HAGANS:  I believe from our standpoint, yes,

10   sir.

11             THE COURT:  Okay.  Let's take a five-minute recess

12   and take up our motion to disqualify.

13        (Recess was taken.)

14             THE COURT:  Please be seated.

15             All right.  Let's go to the motion to disqualify,

16   and who would like to be heard on that?  Mr. Barquist?

17             MR. BARQUIST:  Your Honor, that is EchoStar's

18   motion, so I guess I will start.  I guess the first question,

19   Your Honor, is, is the motion moot?  Your Honor asked that in

20   the order setting today's hearing, and I would like to address

21   that.  I want to emphasize before we get into the motion as a

22   whole if -- as needed.  Although EchoStar believes the motion

23   is not completely moot, certainly circumstances have changed.

24   We are very much aware of that.  And I don't want the Court to

25   feel that we are hanging on to this motion without reason.  We

1  have tried to work with Mr. Hagans and his team --

2          THE COURT:  You are looking for a comfort level,

3  right?

4          MR. BARQUIST:  Your Honor, there is a few -- yes.  I

5  mean, there are a few open items that we would like to resolve

6  them quickly and get this behind us.  We have no reason to

7  hang on to this any longer than we need to.  Mr. Hagans told

8  the Court this morning that Mr. Luck is going to terminate his

9  work on the case.  We are glad to hear that because it

10 resolves an issue.  We would like to get clarity in the form

11 of either a representation or an order about when --

12         THE COURT:  When will that be done, Mr. Hagans?

13         MR. HAGANS:  No later than tomorrow afternoon.  I

14 don't know what time I will get back today.  No later than

15 tomorrow afternoon.  And I think you can appreciate that I

16 couldn't do much until I knew whether or not things were

17 continued because I didn't know how much the transition was

18 going to be --

19         THE COURT:  Okay.  5:00 p.m. tomorrow.

20         MR. BARQUIST:  So I think -- let me just clarify if

21 I could, Your Honor, since we are making progress here.  That

22 would include not only Mr. Luck but any lawyer at the Godwin

23 Firm or formerly at the Godwin Firm?

24         THE COURT:  Is that correct, Mr. Hagans?

25         MR. HAGANS:  That's correct.

1        MR. BARQUIST:  Thank you.

2        I think the only remaining open item, Your Honor,

3   really is then what work product of the Godwin Firm,

4   particularly of Mr. Carlyle, can properly be transferred to

5   the new team of lawyers.  And, again, we have tried to work

6   with Mr. Hagans to narrow the issues there.  We told Mr.

7   Hagans that we had no objection to any of the work product

8   relating to the technical side of the case; the infringement

9   analysis, the invalidity analysis, all of that no problem

10  because we don't think Mr. Carlyle's past work relates to

11  those technical issues.  It doesn't relate to the overlap

12  between the cases.  And so we have said that is fine.

13        What we have asked for and where we are -- now we

14  are getting into the merits of the motion.  The place where

15  the cases overlap, where the current case overlaps and where

16  Mr. Carlyle's former representation of EchoStar overlaps is in

17  the damages issues.  Mr. Carlyle while he was working at the

18  Welch Firm worked on literally dozens of matters for EchoStar,

19  many of which involved damages issues, of course.  And he was

20  heavily involved in the discovery and analysis of those

21  damages issues.  Of course, there is a damages issue in this

22  case.  And there is an overlap even though he didn't work on

23  patent cases because the same products and services are

24  involved, the same satellite receivers and the same television

25  services.  Part of Forgent's damages theory in this case is

1   they want a royalty based not on just the sale of these boxes,

2   but the services that are provided on a month-to-month basis.

3   And those are exactly the issues that Mr. Carlyle worked on in

4   the other cases at the Welch Firm.

5            So what we have asked for to try to resolve this is

6   an identification of exactly what Mr. Carlyle did on this case

7   at the Godwin Firm, and we have asked for, pursuant to the

8   In re: George case, which is the Texas Supreme Court case

9   which I think provides guidance on this issue, we have asked

10  for a list, an inventory, the case calls it, of the work

11  product that he created and that is involved in the issues of

12  damages to Mr. Carlyle's work. And we have gotten partial

13  answers to those requests but not complete answers. We are

14  told that the majority of his work involved damages, but that

15  sort of leaves open, Your Honor, what was the rest of it?

16           We have gotten inconsistent information about whether

17  he provided information to the experts. Mr. Hagans wrote me a

18  letter that said he didn't provide any information to the

19  Forgent experts except for documents produced by the parties.

20  Well, we don't know what documents those were. And we don't

21  know who they were given to. But clearly if Mr. Carlyle was

22  involved in selecting documents which involves attorney work

23  product, of course, the selection process, selecting documents

24  and providing them to experts, that is his work product that

25  we need to know more about before we can just say the matter

1   is closed. And we have asked for this

2   inventory, this list of his work product and we haven't gotten

3   that. So those are the open items, Your Honor, as I see it.

4           THE COURT: What is Forgent's position with regard

5   to providing an inventory?

6           MR. HAGANS: Judge, I will jump ahead to that. Let

7   me say -- I am sorry. We don't think that is appropriate.

8   However, I have here for you the inventory and the documents

9   so you can take a look at it.

10          THE COURT: For me to take a look --

11          MR. HAGANS: No, for you to take a look at it

12  because this would be his work product. Whether there is

13  anything there, I can't --

14          THE COURT: How long is it?

15          MR. HAGANS: It is in that envelope. There are six

16  items. And let me tell you what we did because we have been

17  very careful not to get any of his information. And the

18  inventory under In re: George comes only after there was a

19  separate hearing with the disqualification. That was part of

20  why we didn't think any of this needed to be done. I have got

21  that here.

22          There are six items. What we did is we knew there

23  was one memo he prepared because we asked him to identify what

24  he had done, and he gave us that and so we knew about that.

25  We then went through the iManage system and looked for his

1   name anywhere and we found five items, so there are a total of

2   six items in here that he did.  But I want to deal with the

3   disqualification because so far as I can hear there are two

4   things that I think are important.  One is they have never

5   been able to identify any kind of confidential information

6   generically.

7           I'm not talking about giving away their privilege.

8   Any kind of confidential information he might have had in the

9   damage area.  I understand how he might have had some

10  confidential information in some other areas.  They said no.

11  But in damage area what kinds of confidential information

12  could he even have?  Damage information is either discoverable

13  or not discoverable.  You are not really confidential.  So

14  that was the first thing.

15          The second is let's be very clear on what Mr.

16  Carlyle has sworn to.  He has said I did not meet with,

17  interview, or speak with any retained expert in this case.

18  Now, I had understood that he had and that is why I had

19  written Mr. Barquist and said he hasn't done anything except

20  with respect to documents that were publicly available or

21  produced in this case.  He says he never talked to them at

22  all.  He says I did not provide any expert in this case with

23  any information or documents.  And then he goes on to say that

24  he didn't have any confidential information, he didn't convey

25  any confidential information to anybody there; that to his

1   knowledge he hasn't disclosed anything on any information that
2   he had.

3          Now, that is what he says.  That is what we have
4   tried to accomplish.  Now, we objected to the motion to
5   disqualify on a number of bases.  One, certainly that it was
6   moot.  That is, they asked to disqualify the firm and the firm
7   is no longer there and we have cited several cases that say
8   that moots it.

9          Secondly, this issue was initially raised just
10  time-wise.  The lawsuit was filed in July, I think July 14th
11  of 2005.  On August 12th EchoStar raised this specific issue.
12  And the Godwin Firm responded and said we have talked to them
13  and we don't think there is any issue.  And nothing happened.
14  It didn't get raised again.

15          THE COURT:  Mr. Carlyle wrote his letter February
16  20th, 2006.

17          MR. HAGANS:  In his letter of February of 2006 if
18  you want to look at that I have got those here and you can
19  compare it.  If you compare it to what Mr. Luck wrote on
20  November 9th the day after the status conference, you will see
21  it is exactly the same except that he has listed only those
22  things that are still in issue.  It is nothing new.  It is the
23  same thing that was written by Mr. Luck in November.

24          And so the very issue -- if he had confidential
25  information, it was imputed and he was disqualified and the

1  firm was disqualified in August.  It is not what he comes up

2  with new.  It is not a new information that he got, and they

3  raise the same issue.  In fact, when they wrote in February

4  they said -- they made reference to what they said in August.

5  So there is an eight-month period of time where they did

6  nothing on this, and the cases have talked about six months

7  being a waiver, so we have objected on waiver.

8          The more important part I think of all of this is

9  there is no disqualification because it is not substantially

10 related.  There is no disqualification because they haven't

11 identified even generically anything that he actually had that

12 would put him in a disqualification area.  They have said he

13 knows about damages, but that is not proprietary, that is not

14 confidential unless there is something unique about it.  And

15 so that is part of the reason that we have objected to all of

16 that.

17         So with respect -- and I guess the final issue, with

18 respect to the declaration that they made we obviously

19 objected to all of that because it was based on hearsay.  This

20 is the Steele affidavit.  It was based on hearsay, it was

21 conclusory.  We don't think there is any disqualification.  To

22 the extent that you feel you need to look at anything, we have

23 got it here so that you can decide whether or not we can look

24 at any of this information because if you tell us we can't

25 look at it, we will just leave it in the system.  If you say

1   this is in any way confidential information --

2            THE COURT:  All right.  Hand it up.

3            MR. HAGANS:  I have got extra copies of the

4   inventory.  Do you want me to give that to the defendants?

5            THE COURT:  Yes, please.  Now, have defendants not

6   gotten the inventory yet?

7            MR. HAGANS:  They have not.  I am just now giving it

8   to them.

9            MR. HAGANS:  I only have three copies here.  We will

10  make others available.

11       (Pause in proceedings.)

12            THE COURT:  All right.  Do I understand this is

13  something that Godwin has prepared from their database and

14  submitted to you, Mr. Hagans, that you have not reviewed yet;

15  and this is a representation of everything that came up from

16  their search for his name or anything that he was involved in

17  with regard to this case?

18            MR. HAGANS:  Almost.  It was actually prepared by

19  Bracewell & Giuliani, personnel pulled it up and copied it and

20  put it in there.  Not by any of the lawyers.  Nobody has

21  looked at it.  They just pulled it, printed it, put it in the

22  envelope.  The descriptions are taken directly from the

23  iManage database.  It was not prepared by Godwin.  What we did

24  is we talked to Mr. Carlyle and asked about the document that

25  he told us about, and we went into the database and found that

1   document.  Without looking at it, we had some somebody print

2   it and put it in that envelope.  But no one has reviewed it.

3   But, in fact, we found it because we then went through the

4   database and looked for his name.

5           THE COURT:  All right.  Mr. Barquist, what is your

6   position with regard to all this?  I know you haven't seen

7   what is in the envelope.

8           MR. BARQUIST:  No, Your Honor, I haven't.

9           THE COURT:  I will tell you I don't think it would

10  be very illuminating to you if you did.

11          MR. BARQUIST:  I understand.  Thank you, Your

12  Honor.  Well, I appreciate getting the inventory.  And if I

13  understand correctly, this iManage system is the Godwin Firm's

14  document management system of -- all memos, letters, et cetera

15  they generate are on that system.  And that system has been

16  turned over -- all of the documents on this case have been

17  turned over to Mr. Hagans and his team.

18          THE COURT:  Is that correct?

19          MR. HAGANS:  Yes, sir.  It is an -- iManage is a

20  document database.  We happen to use the same system.  I don't

21  know if Bracewell does or not.  They put it on their computers

22  instead of us because of the capacity -- it is actually on

23  their system, not mine.  But, yes, and that is the system that

24  Godwin uses.

25          THE COURT:  All right.

1   MR. BARQUIST: Your Honor, I suppose it is possible

2   that there are things that he wrote, notes that he wrote that

3   are not on the system. But clearly this goes a long way. I

4   mean, if there was some kind of representation about

5   nondocument management system documents that -- Mr. Carlyle's

6   working files, notes, or whatever representation that either

7   those haven't transferred or quarantined -- again, I am not

8   trying to beat a dead horse here. I am trying to close all of

9   the issues out. But I think we are just about there, Your

10  Honor, and I appreciate Mr. Hagan's efforts and Your Honor's

11  efforts.

12          THE COURT: Well, I will say of the six documents --

13  how many are in here?

14          MR. HAGANS: Six.

15          THE COURT: One of them has already been filed in

16  this case. The second one is something that both sides

17  already have a copy of. The third one is something both sides

18  already have a copy of. And the other three, one is a

19  standard employment agreement with a consulting expert that

20  just sets forth the rates of the expert's agreement and the

21  terms of their representation. The fourth is a memo from

22  Carlyle to Luck basically responding to what his involvement

23  was at EchoStar and why it doesn't constitute a conflict.

24  That is dated August 15th, 2005, just outlining the work he

25  did and that it was not involved with any patent cases.

1    And then the sixth does appear to be a proposal

2    that -- I take it this was drafted by Mr. Luck -- Mr.

3    Carlyle's name does not appear in it, but it was drafted by

4    him. That is two pages that is basically a damage analysis

5    proposal with regard to defendants, which is just sort of a

6    typical patent case type analysis. I mean it doesn't seem

7    to -- it is based on -- basically it would appear to me what

8    would be publicly-known information that any person would go

9    through in a damage analysis on a patent case.

10    So that is all I will say about those. And I will

11    just ask whether, Mr. Barquist, you have a comfort level at

12    this point, or do you wish to pursue this matter further?

13    MR. BARQUIST: Your Honor, again, all I would ask is

14    if there is any other work product aside from what was on the

15    iManage system, but I am certainly satisfied as to what has

16    been turned over from the iManage system and Your Honor's

17    comments about it.

18    THE COURT: All right.

19    MR. HAGANS: We have his affidavit in terms of what

20    he had done. We have not -- we have been sort of careful

21    about not going through and searching for anything because of

22    the sensitivity of this issue. We are not aware of anything

23    else. We have asked him if anything else exists. He says no.

24    He identified the one memo he had found.

25    THE COURT: He doesn't have any handwritten notes or

1  a file on it or anything?

2        MR. HAGANS:  So he says.  I don't know.  He says

3  no.  And, I mean, I can go back and ask again.

4        THE COURT:  Do you want to take his deposition?

5        MR. BARQUIST:  I really don't want to do that, Your

6  Honor.  If he has notes, I mean I guess the question --

7        THE COURT:  All right.  The Court will order if he

8  has or can lay his hands on any other documents handwritten or

9  otherwise or on a computer anywhere that are in any manner

10 related to this case and work that he did on it, other than

11 the six documents that have been produced to me today, then he

12 should produce those to you in a sealed envelope and you

13 produce them to me, and I will -- I don't know whether we will

14 have a hearing or -- I will review it and give you a summary

15 and see where you are without revealing exactly what is in

16 them.

17       MR. HAGANS:  The other thing is everybody on our

18 team is sensitive to --

19       THE COURT:  You ought to be.

20       MR. HAGANS:  Sir?

21       THE COURT:  You ought to be.

22       MR. HAGANS:  We are.  As I told Mr. Barquist from

23 the very beginning, I don't want his stuff.  I want our stuff.

24 And I don't want to be unduly limited but I want to be

25 sensitive to that.  I understand that.  So we have tried to be

1   very, very careful.  That is why this has taken a little bit

2   of time.  What I would do is I will both orally and in writing

3   ask him if there is anything else that he has and that he

4   directs us to it.  Also, I will tell the Court we have

5   standing instructions that if anybody runs across something,

6   don't look at it.  Stop, seal it, and we will get that to

7   you.  Because I mean I'm not asking anybody to be perfect, but

8   we are doing the best we can.

9           THE COURT:  Okay.  All right.

10           MR. BARQUIST:  Thank you, Your Honor.  I appreciate

11   it.

12           THE COURT:  What would you like done with your

13   motion?  Would you like to withdraw it at this time as moot

14   and then you can refile it if you get anything else or would

15   you like an order -- me ordering them to do what I just told

16   them to do?

17           MR. BARQUIST:  I would prefer the latter, Your

18   Honor.

19           THE COURT:  All right.  The Court will deny the

20   motion to withdraw as moot but order Forgent to make inquiry

21   of Mr. Carlyle for him to make a diligent search for any

22   notes, files, documents contained on any other source other

23   than the six -- that he knows reasonably might exist, other

24   than the six documents produced today for in camera

25   inspection; and produce those within 10 days from today to the

1   Court or his affidavit that no such documents exist.

2           MR. HAGANS:  Will do.

3           THE COURT:  Okay.  Very well.  Mr. Barquist, would

4   you like to type that up and put that in an order for me?

5           MR. BARQUIST:  Yes, Your Honor, I will.

6           THE COURT:  If you will e-mail it to me and submit

7   it to opposing counsel I will sign it and get that done.  What

8   else can the Court do to help us move it along?

9           MR. HAGANS:  I think you have been -- there is one

10  other thing.  We asked the defendants to allow Jamie Stevens,

11  the consultant with Forgent, to be covered within the

12  protective order so he can look at the documents.  We have not

13  heard any objection to that but we haven't gotten any

14  affirmation either.

15          MR. JONES:  I think we have asked for his

16  information.  We do need his information to run it by our

17  client.  If we can have that, I think we can work this out.

18          THE COURT:  When can you have that information?

19          MR. HAGANS:  This afternoon.

20          THE COURT:  When can you respond, Mr. Jones?

21          MR. JONES:  Three days -- within the time of the

22  protective order is what my other defendants are requesting.

23  Would that be all right, Your Honor?

24          THE COURT:  How long is that?

25          MR. JONES:  Five days, Your Honor.

1        THE COURT:  Is that all right with you?

2        MR. HAGANS:  Sure.

3        THE COURT:  Great.  Wonderful.  We are making

4    progress.

5        MR. JONES:  Thank you, Your Honor.

6        THE COURT:  How about the mediator?  Who is your

7    mediator?  Who is going to get this resolved for me?

8        MR. HAGANS:  I think you had already -- before we

9    got involved in this Judge Faulkner.

10        THE COURT:  Have you met with him yet?

11        MR. HAGANS:  I think that the parties -- I haven't.

12    But before we got into it there was a mediation shortly before

13    we got into it, which I understand he has filed a report

14    saying an impasse was reached.  But, again, I wasn't there.

15        THE COURT:  I would ask you, Mr. Hagans, to call

16    Judge Faulkner and just have a candid discussion with him as

17    to where your client is at this point.  And then I don't know

18    how close -- let me just ask the defendants do you see any

19    prospect -- I normally like to have cases mediated pre-Markman

20    which is now set for probably in October.  You know, before we

21    go through Markman and y'all go through all of the expensive

22    briefing, would it be beneficial now that new counsel are

23    involved after you have had a chance to get up to speed and

24    get your documents that you need and everything, to spend a

25    day in mediation and see if it might get somewhere?

1          MR. HAGANS:  We are more than happy to do that.

2          THE COURT:  What about defendants?

3          MR. JONES:  For my clients we are more than happy to

4    do that, Your Honor.  I will say this:  We did mediate it

5    before.  And hopefully new counsel is there and there is a new

6    attitude and a new decision-making body.  We were way apart at

7    that time.  It didn't look very hopeful at that point.  If the

8    world has changed --

9          THE COURT:  I am sure new counsel will want more

10   money than old counsel.  They always do or they don't get

11   hired.

12         MR. JONES:  If that is true, we might all be wasting

13   our time, Your Honor.  But he might talk to Judge Faulkner --

14         THE COURT:  But sometimes they are more reasonable,

15   too.

16         MR. HAGANS:  My experience has been, not as much as

17   yours, but that settlement discussions are a process, not

18   necessarily a one-day event.  And this is an important part of

19   the process.  And we will make every effort to -- for

20   everybody's sake, mine particularly, to get it settled.  And

21   if not, we will let you know.  But we will do more than just

22   give it lip service.

23         THE COURT:  Show up.

24         MR. HAGANS:  Well, and just give it lip service.

25         MR. ROTH:  Judge, I was at the mediation.  And Judge

1  Faulkner's comment at the end of the day, and he worked very,

2  very hard for a full day on this; but his comment was is that

3  maybe we will make another try after <u>Markman</u> was his comment.

4            THE COURT:  Okay.  All right.  Well, I will order

5  y'all to make another try before <u>Markman</u> sometime between now

6  and October.  So sometime along about August or September if

7  Mr. Hagans you would visit with other counsel, get some dates

8  from them that will work, go ahead and get it on Judge

9  Faulkner's calendar for August or September.  And then he can

10  get a letter out to them.  When you talk to him let him know

11  you are onboard and sort of where you are and review the

12  history with him.  Communicate to him that I would like

13  another shot at <u>Markman</u> sometime along about August or

14  September.  Get a date and get it on everybody's calendar

15  where they can have their principals present and y'all can

16  make a good run at it before everybody spends all the money on

17  <u>Markman</u> and we spend all the time to write it.  We will be

18  glad to do it if we get to that stage.

19            But I have told parties before and we just had three

20  patent cases settle, and I think two of them were prior to

21  <u>Markman</u> the last couple of weeks.  I believe it to be true.

22  Both sides know that, you know, what settles cases is when

23  both sides have substantial risk.  That is usually when you

24  are staring a jury in the face and you really get down to

25  evaluating your case.  And good lawyers on both sides, which I

1   feel like we have got -- clearly have in this case evaluate

2   their case, it ought to settle.

3           The other big thing in a patent case that both sides

4   have substantial risk is the <u>Markman</u>.  It can make a case.  It

5   can break a case.  So I think that that is the time that

6   everybody needs to look at their whole cards and evaluate the

7   risk of how they are going to come out with <u>Markman</u> rather

8   than looking at it like it is a free bite at the apple

9   because it is certainly not.  You could end up with a very bad

10  <u>Markman</u> opinion from a plaintiff's standpoint or a very bad

11  from the defendant's standpoint.  And I think the parties

12  ought to make every effort to try to resolve it prior to

13  <u>Markman</u> if they can.  So I am through with my philosophy about

14  that.

15          Anything else I can help you with today?

16          MR. HAGANS:  Not from the plaintiffs, Your Honor.

17          THE COURT:  Defendants?

18          MR. JONES:  No, Your Honor.

19          THE COURT:  Okay.  Good luck to you.  And I hope we

20  don't see you again.

21          (End of proceedings.)

22

23

24

25

1            C E R T I F I C A T I O N

2

3    I certify that the foregoing is a correct transcript from the

4    record of proceedings in the above-entitled matter.

5

6

7                                          5/19/06

8    SHEA SLOAN, CSR, RPR
     OFFICIAL COURT REPORTER
9    STATE OF TEXAS NO. 3081

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25